**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| GENZYME CORPORATION,<br>a Massachusetts corporation<br>500 Kendall Street<br>Cambridge, MA 02142,<br><br>            Plaintiff,<br><br>      v.<br><br>SHIRE HUMAN GENETIC<br>THERAPIES, INC., a Delaware<br>corporation<br>300 Shire Way<br>Lexington, MA 02421<br><br>      and<br><br>SHIRE plc, a Republic of Ireland<br>public company<br>5 Riverwalk<br>Citywest Business Campus<br>Dublin 24<br>Republic of Ireland,<br><br>            Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Civil Action No. _____<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## VERIFIED COMPLAINT

Scott P. Lewis, BBO # 298740
ANDERSON & KREIGER LLP
One Canal Park, Suite 200
Cambridge, M.A. 02141
(617) 621-6560
slewis@andersonkreiger.com

Steven P. Hollman (*pro hac vice* pending)
Laura E. Schabinger (*pro hac vice* pending)
HOGAN LOVELLS US LLP

555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5672 (Telephone)
(202) 637-5910 (Fax)
steven.hollman@hoganlovells.com
laura.schabinger@hoganlovells.com

*Attorneys for Plaintiff*
*Genzyme Corporation*

## NATURE OF ACTION

1.      This is an action against Shire Human Genetic Therapies, Inc. ("Shire HGT")

and Shire plc ("Shire") for injunctive and monetary relief for false advertising in violation of

the Lanham Act (15 U.S.C. § 1125, *et seq.*).  On June 28, 2012, Shire HGT and/or Shire

published a press release (the "Shire Press Release") entitled "Shire's VPRIV® (velaglucerase

alfa for injection) Shows Significant Improvement in Gaucher-Related Bone Disease."  The

Shire Press Release purported to describe "new data" presented from a "head to head trial" of

two competing drugs used to replace a deficient enzyme in patients suffering from a rare

genetic disorder, Gaucher disease.  However, the Shire Press Release contained false and

misleading statements regarding the nature of the analysis conducted by Shire HGT and/or

Shire and the capabilities of Shire's drug, VPRIV®, as compared to the market leading drug,

Cerezyme® (imiglucerase for injection), manufactured and sold by Genzyme Corporation

("Genzyme").

2.      Shire placed the Shire Press Release on its public corporate website under the

headline "Latest News."  The Shire website is accessible by people throughout the United States,

including healthcare providers and patients.  Upon information and belief, Shire HGT and/or

Shire also provided a copy of the Shire Press Release to PR Newswire, which distributes press

releases to media outlets throughout the country, and they caused their public relations firm to

distribute the Shire Press Release to certain Gaucher patient organizations.

3.      The Shire Press Release has been picked up by at least 33 media outlets,

including but not limited to the Wall Street Journal online (online.wsj.com), Indiana NBC

affiliate WTHR (wthr.com), Delaware Fox affiliate WBOC 16 (wboc.com), Eastern Texas ABC

affiliate KTRE 9 (ktre.com), and pharmaceutical newsletter Fierce Pharma (fiercepharma.com).

The Shire Press Release also has been posted on the homepage for the National Gaucher Foundation, an independent non-profit organization serving the Gaucher patient community.

## JURISDICTION AND VENUE

4.      This Court has original jurisdiction of this action under 28 U.S.C. § 1331, in that the case involves a federal question.

5.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) in that Shire HGT resides in this District and Shire conducts extensive business within this District.

## PARTIES

6.      Genzyme, a subsidiary of Sanofi SA, is a biotechnology corporation organized under the laws of the Commonwealth of Massachusetts, with its principal place of business located at 500 Kendall Street, Cambridge, Massachusetts.  Genzyme's products are focused on rare genetic disorders and multiple sclerosis, among other infirmities.  Genzyme manufactures and sells a drug called Cerezyme (imiglucerase for injection), which is indicated for long-term enzyme replacement therapy for certain patients with a confirmed diagnosis of Type 1 Gaucher disease.  The Food and Drug Administration (FDA) approved Cerezyme in 1994 as a long-term enzyme replacement therapy for adult and pediatric patients with Type 1 Gaucher disease that results in one or more of the following conditions: anemia (low red blood cell count), thrombocytopenia (low blood platelet count), bone disease, or hepatomegaly/splenomegaly (enlarged liver or spleen).   Genzyme sells Cerezyme to customers throughout the United States.

7.      Upon information and belief, Shire HGT is a specialty biopharmaceutical corporation organized under the laws of Delaware with its principal place of business located at 300 Shire Way, Lexington, Massachusetts.  Upon information and belief, Shire HGT

manufactures, advertises, and sells a drug, VPRIV, to customers throughout the United States. VPRIV was approved by the FDA in 2010 as a long-term enzyme replacement therapy for adult and pediatric patients with Type 1 Gaucher disease. Shire HGT is a direct, head-to-head competitor of Genzyme in the pharmaceutical market for enzyme replacement therapy for individuals with Type 1 Gaucher disease.

8.     Upon information and belief, Shire plc is a public company organized under the laws of the Republic of Ireland with its principal place of business located at 5 Riverwalk, Citywest Business Campus, Dublin 24, Republic of Ireland. Upon information and belief, Shire engages in business in and throughout the United States, including owning and licensing the sale of VPRIV in the United States.

9.     Genzyme has standing to bring this suit because Genzyme's drug, Cerezyme, was identified by name in the Shire Press Release and, as a competitor of Shire HGT and Shire, it has been harmed by the false and misleading claims of Shire HGT and Shire regarding the capabilities of Cerezyme and VPRIV.

## FACTUAL ALLEGATIONS

10.     Gaucher disease is a rare genetic disorder in which the body lacks enough of the enzyme glucocerebrosidase, which is needed to break down certain fatty materials, or lipids. Without this enzyme, harmful amounts of lipids can build up in the liver, spleen, bones, bone marrow and nervous system, and can prevent cells and organs from working properly. As a result, cells that have built up a lot of the glucocerebrosidase enzyme, or "Gaucher cells," can accumulate and displace healthy normal cells in bone marrow and organs such as the liver and spleen. People suffering from Gaucher disease may experience symptoms such as easy bruising or bleeding, weakness, anemia, bone or joint pain, enlarged liver or spleen, reduced

bone mineral density, and weakened bones that are easily fractured.

11.     There are three main types of Gaucher disease.  The most common, Type 1, is marked by bone disease, anemia, an enlarged spleen and a relative decrease in the number of platelets in blood.  Patients with Type 1 Gaucher disease also can experience bone thinning, where bone mass and density are diminished.  As a result, the weakened bone is more susceptible to fractures.

12.     For most patients with Gaucher disease, once liver and/or spleen enlargement is treated, the greatest impact on patients' lives and morbidity comes from bone disease.  As a result, a treatment's impact on bone mineral density is of particular importance within the Gaucher community.

13.     Approximately 1 in 40,000 people in the general population are affected by Gaucher disease, or about 10,000 people worldwide.  In the United States, it is estimated that approximately 3,200 people currently suffer from Gaucher disease, with over 1,700 currently receiving treatment, including investigational therapies in clinical trials.

14.     In May 1994, the FDA granted approval for Genzyme to begin selling Cerezyme for treatment of people suffering from Type 1 Gaucher disease.  Cerezyme is indicated (i.e., FDA-approved) as a long-term enzyme replacement therapy for adult and pediatric patients with Type 1 Gaucher disease that results in one or more of the following conditions: anemia (low red blood cell count), thrombocytopenia (low blood platelet count), bone disease, or hepatomegaly/splenomegaly (enlarged liver or spleen).  Today Cerezyme is the leading enzyme replacement therapy treatment for people with Type 1 Gaucher disease, having been used over the years by approximately 6,000 patients around the world.  Cerezyme acts like a naturally occurring enzyme and targets cells that have a buildup of the lipid.

15.     Approved by the FDA in February 2010, VPRIV is an enzyme replacement therapy developed and manufactured by Shire HGT for treatment of Type 1 Gaucher disease. Like Cerezyme, it is designed to work by replacing or supplementing the patient's nonworking glucocerebrosidase enzyme.  VPRIV is indicated for long-term enzyme replacement therapy for pediatric and adult patients with Type 1 Gaucher disease.

16.     Cerezyme and VPRIV are the two main competitor drugs in the enzyme replacement therapy market for treatment of Gaucher disease, with Cerezyme as the market leader.

17.     On June 28, 2012, Shire HGT and/or Shire issued the Shire Press Release, a false and/or misleading press release entitled "Shire's VPRIV® (velaglucerase alfa for injection) Shows Significant Improvement in Gaucher-Related Bone Disease."  See Schabinger Decl. Ex. A.  The Shire Press Release was posted on the main website page for Shire under the headline "Latest News."

18.     Two of the individuals identified in the Shire Press Release as sources of additional information, Jessica Cotrone and Eric Rojas, have phone numbers listed in an area code for Boston and surrounding suburbs.  Upon information and belief, Jessica Cotrone is the Director of Corporate Communications for Shire HGT, and Eric Rojas is the Senior Director of Investor Relations for Shire HGT.  The other two individuals identified in the Shire Press Release as sources of additional information, Sarah Elton-Farr and Jessica Mann, have phone numbers listed in an international area code for the United Kingdom.

19.     Upon information and belief, Shire HGT and/or Shire caused the Shire Press Release to be sent to a news distribution service, PR Newswire, for dissemination to media outlets throughout the United States.  As of the date of this Complaint, at least 33 different

media outlets have published the Shire Press Release received from PR Newswire, including

but not limited to the Wall Street Journal online (online.wsj.com), Indiana NBC affiliate

WTHR (wthr.com), Delaware Fox affiliate WBOC 16 (wboc.com), Eastern Texas ABC

affiliate KTRE 9 (ktre.com), and pharmaceutical newsletter Fierce Pharma

(fiercepharma.com). See Schabinger Decl. Ex. B.

20.     Upon information and belief, Shire HGT and/or Shire also caused its public

relations agency to distribute the Shire Press Release to at least certain patient organizations

focusing on the Gaucher community.  Upon information and belief, one of the patient

organizations to which the Shire Press Release was distributed is the National Gaucher

Foundation ("NGF"), which has posted the press release on its homepage for its website.  See

Schabinger Decl. Ex. C.  The NGF is a non-profit organization that was established in 1984 for

the purpose of serving people afflicted with Gaucher disease.  The NGF funds research, grants

financial assistance, promotes education and awareness, and supports legislation regarding

Gaucher disease.  As a result, the NGF is viewed by the Gaucher patient community as a

leading objective source of information for Gaucher patients.

21.     The intended audience of the Shire Press Release includes at least patients

suffering from Type 1 Gaucher disease who require enzyme replacement therapy and

healthcare professionals who may treat Type 1 Gaucher patients.

22.     The Shire Press Release constitutes a commercial advertisement and

promotional material under the Lanham Act.  Shire HGT and Shire, through their Press

Release, seek to promote sales of VPRIV and to gain an unfair competitive advantage over

Genzyme in the marketplace.

23.     The Shire Press Release purports to describe results in lumbar spine BMD at

nine months from a "head-to-head" clinical trial of patients on VPRIV and Cerezyme.  In

reality, the Shire Press Release makes superiority claims about BMD improvement based on

clinical studies that were conducted for a different principal purpose.  In making their

superiority claim, Shire HGT and/or Shire used an exploratory, retrospective, subgroup

analysis of data collected by Shire HGT and/or Shire in 2008 and 2009 during one of the initial

Phase III clinical trials submitted to FDA for approval of VPRIV ("Trial 39").  This original

study was a nine-month study focused primarily on changes in hemoglobin concentration for

patients taking the two drugs.  The secondary focuses, or "endpoints," of the original study

were the change in blood platelets, spleen volume, liver volume, levels of the enzyme

chitotriosidase, CCL18 levels, antibody response, and response time (assessed using

hemoglobin concentration).

24.     Change in BMD was neither a primary nor secondary endpoint of the original

study.  However, change in BMD was an exploratory endpoint of the original study.  As a

result, researchers also gathered data from patients regarding changes in BMD.

25.     In clinical studies, evidence is based largely on primary endpoints, with

secondary endpoints serving as supportive measures.  Data gathered from exploratory

endpoints are not viewed as evidence of clinical or statistical significance and cannot properly

be used to draw conclusions, such as determining superiority between two drugs.  Instead,

exploratory endpoints are hypothesis-generating rather than hypothesis-confirming, meaning

that the results only are used to help investigators generate hypotheses to test in subsequent

clinical trials.  Consequently, in order to draw conclusions based on exploratory endpoints,

Shire HGT and/or Shire would need to conduct another clinical trial in which the exploratory

endpoint would become the primary or secondary endpoint.

26.     According to the Shire Press Release, patients' BMD was measured in Trial 39 prior to treatment in order to determine a baseline score and also was measured at 9 months in order to determine the degree of improvement, if any, to the patient's BMD.  Tests were conducted both on the patients' lumbar spine and on the neck of femoral bones.  BMD scores were calculated using "Z-scores," which is a standard statistical score that shows the number of standard deviations above or below normally expected bone mass for a person of the same patient's age, sex, weight and ethnic or racial origin.  In other words, the Z-scores are a method by which to compare a Gaucher patient's BMD against a normalized measurement of BMD for patients without Gaucher disease.

27.     The Shire Press Release also describes data from an ongoing, follow-on trial ("Trial 44").  In Trial 44, 24 patients that had completed Trial 39 were enrolled.  Of these 24 patients, 19 patients were not taking other bone health drugs at the same time: 11 patients in the VPRIV group and 8 patients in the Cerezyme group.  The 11 patients that previously received VPRIV in Trial 39 continued receiving VPRIV, while the 8 patient that previously received Cerezyme in Trial 39 were switched from Cerezyme to VPRIV.  The purpose of Trial 44 is to evaluate the long-term safety of VPRIV, and the assessment of BMD was exploratory. BMD for these 19 patients was measured at the end of an additional 15 months of treatment with VPRIV.

28.     The Shire Press Release makes comparative claims of superiority between VPRIV and Cerezyme, either through direct comparisons or by necessary implication. Specifically, the subheadline of the Shire Press Release states that "In a head-to-head trial between VPRIV and Cerezyme (imiglucerase), only patients treated with VPRIV experience statistically significant improvement in lumbar spine bone mineral density at nine months."

Schabinger Decl. Ex. A (emphasis added).  Paragraph 5 of the Shire Press Release also

describes how the clinical study showed "clinically and statistically significant improvement

from baseline in mean [lumbar spine] Z-score . . . at nine months of treatment with VPRIV,

but not in the cohort of patients treated with Cerezyme."  Id. (emphasis added).  Moreover,

Paragraph 5 goes on to present, in direct proximity, data from patients treated with VPRIV and

patients treated with Cerezyme.  The totality of these claims literally state or necessarily imply,

based on the data, that VPRIV offers a clinical advantage over Cerezyme.

29.    The Shire Press Release contains false and misleading claims about the nature

of the clinical trials and retrospective analysis conducted on BMD data.  The Shire Press

Release also contains false and misleading claims about the comparative capabilities of

VPRIV and Cerezyme for improving BMD in Type 1 Gaucher patients.  These false and

misleading statements form the basis of this Complaint.

30.    The Shire Press Release generally conveys the impression that Shire has "new

data" concerning the efficacy of VPRIV over Cerezyme to improve BMD.  But there is no new

data, and the comparative efficacy claims are not properly substantiated.

31.    The Shire Press Release falsely and/or misleadingly states that the "new data"

shows that VPRIV significantly improves selected markers of Gaucher-related bone disease as

compared to Cerezyme.  However, this analysis is based on data obtained from Trial 39, which

was conducted between January 2008 and May 2009, more than three years before the Shire

Press Release was issued.  Therefore, this emphasis on "new data" conveys the false and

misleading message that the significant improvement at nine months was a result of data

obtained during a recently-conducted clinical trial in which subjects specifically were brought

in and tested for changes in BMD.  Furthermore, the nine-month BMD analysis that is

described in the Shire Press release is from retrospective, not prospective, analyses.  In addition, the retrospective analysis of BMD was not based on all the patients enrolled in Trial 39 but on a retrospectively-determined subgroup.

32.     Moreover, the Shire Press Release conveys an overall false message that the studies on which Defendants' analysis are based were designed specifically to evaluate whether changes in BMD were statistically significant.  In fact, changes in BMD were neither a primary nor a secondary endpoint of the studies; rather BMD merely was an exploratory endpoint.  Trial 39 was designed to measure changes in hemoglobin, blood platelets, spleen volume, liver volume, levels of the enzyme chitotriosidase, and CCL18 levels, and Trial 44 was designed to evaluate safety and enlargement of the liver and other organs.  Thus, the advertising claims made by Shire HGT and/or Shire in the Shire Press Release are false and misleading because the data derives from an analysis of a trial that was not designed to test for statistically valid changes in BMD to be used for comparative purposes.

33.     In addition, the retrospective analysis described by the Shire Press Release is biased and does not substantiate the advertising claims made by Shire HGT and Shire that VPRIV shows "clinically and statistically significant improvement" in BMD and that VPRIV improves BMD better than Cerezyme.  The analysis  is not valid or sufficiently reliable to permit one to conclude with reasonable certainty that VPRIV provides a statistically significant improvement in BMD as compared to Cerezyme.  The methodology used to conduct the retrospective analysis is not sufficiently reliable to arrive at this conclusion for at least the following reasons:

  a.     The comparison of changes in BMD for patients taking VPRIV and Cerezyme is based upon a number of subgroup analyses that were

conducted retrospectively on data collected from the original 2008-2009 Phase III study.  In addition, BMD was not a primary or secondary endpoint of the study; rather, BMD was measured as an "exploratory" endpoint, which cannot properly be used as evidence of clinical superiority.  Because the study was designed to test for endpoints other than BMD, the subject inclusion and exclusion criteria, the number of subjects enrolled, and the criteria to randomize subjects between treatments all were designed to demonstrate changes in these primary and secondary endpoints with sufficient statistical power and significance.  The trials were <u>not</u> designed to do so for changes in BMD, and consequently, they cannot be used to support comparative efficacy claims regarding BMD.

b.   Retrospective subgroup analysis of exploratory endpoints cannot be used to substantiate comparative efficacy claims.  In fact, the FDA has issued several enforcement letters, including one to a Shire-owned subsidiary, determining that these types of analyses do not constitute substantial clinical evidence to support the comparative claims that Shire HGT and/or Shire make in the Press Release.  Schabinger Decl. Ex. D (concluding that Shire had made unsubstantiated superiority claims because, in part, "The exploratory analysis included in the brochure was retrospective and post-hoc to the study's original design, and did not show a statistically significant difference between the treatment effect of Lialda and Asacol.").  Thus, Shire HGT and/or Shire knew, or they acted in reckless disregard for the fact, that retrospective subgroup analysis of exploratory endpoints is not

a sufficient basis for making comparative efficacy claims in advertising.

c.      The main data advertised by the Shire Press Release – the difference in mean changes from baseline in lumbar spine BMD Z-score of the two treatment groups – is neither statistically valid nor reliable.  The 95% confidence intervals cover a wide range of possible mean changes in BMD. In other words, individual patient responses to the two drugs varied widely, and the distribution of these patient responses overlapped.  Given that the confidence intervals for the VPRIV and Cerezyme patient groups contain a significant amount of overlap, a statistical difference between the two groups does not in any likelihood exist at all.  Thus, the conclusion cannot be drawn that the mean changes in BMD are different, as opposed to being a result of mere chance.  In other words, given that there is no significant difference between the groups for the outcomes measured, no conclusion regarding comparative effectiveness or superiority can be drawn.  It also was misleading for Shire and/or Shire HGT to fail to disclose in the Shire Press Release that no conclusion regarding group-to-group comparisons can be made based on the data from the study.

d.      The subgroup analysis described in the Shire Press Release analyzed only 19 subjects from the original pool of 34 patients enrolled in Study 39. Furthermore, even though 24 patients that completed Study 39 enrolled in Study 44, data from only 19 of these patients were analyzed.  Thus, the analysis based on 19 patients actually was an analysis of a subgroup of a subgroup.  In order for a clinical study to be sufficiently powered, the

clinical study needs to be prospectively designed to determine the number of patients that is required to detect a particular treatment effect. However, because the BMD analysis was exploratory, the studies were not designed to be sufficiently powered for this analysis. In addition, even assuming that the original study was sufficiently powered for this exploratory endpoint, the BMD analysis is based on a subgroup of a subgroup. Consequently, this retrospective BMD analysis is insufficiently powered to draw statistically significant conclusions.

34.     Even if the analysis had been conducted in a valid and reliable manner, the analysis would not establish the proposition asserted in the Shire Press Release that VPRIV shows "clinically and statistically significant improvement" in BMD as compared to Cerezyme. The retrospective analysis does not establish the proposition that VPRIV improves BMD better than Cerezyme for at least the following reasons:

a.     At baseline, prior to starting treatment, the patients in the VPRIV group had a greater BMD deficiency than patients in the Cerezyme group; thus, the conclusion that patients on VPRIV showed greater improvement in BMD than patients on Cerezyme is not an apples-to-apples comparison. The mean baseline lumbar spine BMD Z-score for patients taking VPRIV (when certain patients were appropriately excluded) was -1.56, meaning 1.56 standard deviations below the norm. In comparison, the mean baseline lumbar spine BMD Z-score for the patients using Cerezyme was -0.47, meaning that these patients on average were only 0.47 standard deviations away from the norm. This difference in Z-score represents an entire

standard deviation difference in the degree to which patients were below the norm for BMD before receiving any of the medication.  Because the Cerezyme patients on average had a much smaller BMD deficiency than patients taking VPRIV, Shire HGT and/or Shire acknowledged in underlying scientific materials – although not in the Shire Press Release itself – that 4 out of the 8, or 50%, of patients using Cerezyme had "normal [bone] density."  In contrast, only 2 out of the 11, or a mere 18%, of VPRIV patients had "normal [bone] density."  This represents an important and meaningful imbalance between the two groups with regard to the proportion of patients with "normal" BMD.  Patients who begin with normal BMD generally will not increase BMD levels at a significant rate above normal.  Thus, patients using VPRIV on average had significantly more room for improvement in BMD levels.  Accordingly, the conclusion made in the Shire Press Release, that patients on VPRIV showed more improvement in BMD as compared to patients on Cerezyme, is based on patients (1) who started from different baselines; (2) who had different capacities to improve; and (3) who might improve at different rates as a result.  In fact, had Shire and/or Shire HGT adjusted properly for baseline differences, patients using Cerezyme may have demonstrated a greater <u>percentage</u> improvement in BMD than patients using VPRIV.

b.      The Shire Press Release also selectively uses mean and median data in order to convey the message that patients on VPRIV showed greater improvement in BMD than patients on Cerezyme.  Specifically, the Shire

Press Release only includes information on the <u>median</u> baseline Z-scores and not the <u>mean</u> or average baseline, even though when describing improvements in BMD, the Shire Press Release switches to <u>mean</u> changes from baseline.  Notably, the median baseline Z-scores were dramatically closer than the mean baseline Z-scores.  As a result, the Shire Press Release conveys a message that the patients' BMD levels were more comparable than they actually were.

c.     In addition, the title of the Shire Press Release makes the general conclusion that VPRIV shows significant improvement in "Gaucher-Related Bone Disease."  However, the body of the Shire Press Release selectively reports only the data relating to measurements taken of BMD in the lumbar spine bone.  Shire HGT and/or Shire did not include BMD Z-scores relating to the neck of the femoral bone in the Shire Press Release because VPRIV was not shown to have a positive effect on femoral BMD after nine months.  Thus, even if these measurements were reliable, they were presented selectively and misleadingly in the Shire Press Release in order to support the conclusion that VPRIV improves BMD more than Cerezyme.

d.     The follow-on extension study, in which 8 patients were switched from Cerezyme to VPRIV after their initial nine-month treatment while 11 patients continued to receive VPRIV after their initial nine-month treatment also does not establish that VPRIV improves BMD more than Cerezyme. Enzyme replacement therapy often takes many months to demonstrate measurable change in BMD because it takes a considerable amount of time

to remove the substrate from bone in order to allow for new bone cells to grow. As a result, bone remodeling takes years to complete. Thus, attributing all of the BMD improvement in the follow-on trial to VPRIV is not scientifically justified. Some of the measurable change in BMD in the follow-on 15-month period may have been a result of the initial nine months of Cerezyme treatment, and not attributable to VPRIV. In fact, the initial Cerezyme treatment may have prepared the bone for the later increase in BMD. Continued treatment of patients with Cerezyme may have produced an equal effect. Furthermore, given the wide and overlapping confidence interval, the true value for the two groups at 9 months might have been very similar; as a result, the difference in mean change in BMD during the follow-on trial for those patients that switched from Cerezyme to VPRIV may have been very minimal. Thus, the conclusion in the Shire Press Release that the follow-on study showed significant comparative improvement for patients because of VPRIV, as opposed to Cerezyme, is unsupported. Nor does the extension trial cure the earlier mismatch of the treatment groups.

e.   Conclusions of product superiority based on exploratory endpoints must be adjusted for multiple endpoints in order to obtain a valid statistical significance. Even though the superiority claims made by the Shire Press Release were based on multiple endpoints as well as an exploratory endpoint, this statistical adjustment was not made. Correcting for these multiple endpoints, a proper statistical analysis would not show

improvement in VPRIV.

35.     All of the foregoing methodological and clinical flaws with the analyses underlying the Shire Press Release present a favorable image of VPRIV, as compared to Cerezyme.  Because all, and not just some, of the flaws point one way (i.e., in favor of VPRIV), one could infer that the flaws did not occur randomly or inadvertently but rather were deliberate.

36.     As a result of the dissemination of the Shire Press Release by Shire HGT and Shire, several news articles have been written about the alleged "new data," which demonstrate that the message conveyed by the Shire Press Release has the tendency to mislead consumers. The first sentence of an article published on June 28, 2012 in Scrip Intelligence, an industry newsletter, summarizes and repeats the false and/or misleading comparative message of the Shire Press Release that VPRIV "provides Gaucher's disease patients with better improvement in spine mineral density than the rival ERT, Cerezyme (imiglulcerase) from Sanofi's Genzyme unit."  See Schabinger Decl. Ex. E (emphasis added).  The article also repeats the false and/or misleading message conveyed by the Shire Press Release that the BMD data is from a "head-to-head trial Shire is conducting," which is false because the data were from a retrospective subgroup analysis of an exploratory endpoint.

37.     The false and/or misleading message conveyed in the Shire Press Release, that VPRIV improves BMD better than Cerezyme, is repeated in at least four additional articles published after the Shire Press Release was disseminated.  See, e.g., Schabinger Decl Ex. F. These articles further demonstrate that the statements made by Shire HGT and/or Shire in the Shire Press Release convey a message of superiority and are likely to deceive customers into believing incorrectly that VPRIV improves BMD better than Cerezyme. Id. (articles entitled

"Shire's Gaucher drug has <u>edge over rival</u> in trial" and "Shire's Vpriv <u>outshines Genzyme's</u> <u>Cerezyme</u> on bone density") (emphasis added).

38.     In response to the dissemination of the Shire Press Release, Genzyme President and Chief Executive Officer, Dr. David P. Meeker, sent a letter on July 9, 2012, to Shire HGT President Dr. Sylvie Gregoire noting the foregoing methodological problems with the analysis underlying the Shire Press Release and the comparative claims made within it.  Schabinger Decl. Ex. G.  The letter requested that Shire HGT and Shire take immediate action to halt the dissemination of the Shire Press Release; remove the Shire Press Release from all Shire corporate websites and from all patient group websites, including the National Gaucher Foundation website; and issue a retraction to be distributed at least as broadly as the original Shire Press Release, making clear the scientific and medical reasons for the retraction. Genzyme sought written confirmation that Shire HGT was moving to take these actions.

39.     In addition, Genzyme sent a second letter on July 9, 2012 to the Medical Director in the United Kingdom and Ireland for Shire HGT.  Schabinger Decl. Ex. H.  This letter also was attached to Dr. Meeker's letter to Dr. Gregoire.  In the second letter, Genzyme provided an in-depth basis for its position that the Shire Press Release violated the ABPI Code of Practice for the Pharmaceutical Industry. The Code was promulgated by the Association of British Pharmaceutical Industry (ABPI).  It establishes self-regulation provisions for the pharmaceutical industry in the United Kingdom, including provisions governing the promotion of prescription-only medicinal products. The Code includes rules governing publication of communications such as the Shire Press Release, which constitutes provision of information concerning prescription-only medicinal products to the general public. The Code reflects legal requirements and best industry practices in the European Union and the United Kingdom and is

recognized as one of the highest standards applicable in the EU both by industry and by competent authorities.  Pursuant to the Code, and in an attempt to find an amicable solution in this matter through inter-company dialogue, Genzyme gave Shire HGT ten working days to respond to the letter.

40.     On July 11, 2012, Dr. Gregoire responded to Genzyme promising a substantive response to Genzyme's complaints in its two letters within a ten-day time rather than the three days initially requested in Dr. Meeker's first letter.  Schabinger Decl. Ex. I.

41.     On July 23, 2012, Genzyme received a confidential response to the two letters, which denied that the Shire Press Release was false or misleading.

42.     As a direct and proximate result of the Shire Press Release, Genzyme has been and is likely to continue to be irreparably injured.  The Shire Press Release is likely to cause a loss of consumer goodwill and a diversion of sales.

## COUNT I

### FALSE ADVERTISING IN VIOLATION OF THE LANHAM ACT,
### 15 U.S.C. § 1125(A) *et seq.*

43.     Genzyme realleges and incorporates by reference the allegations contained in numbered paragraphs 1 through 42 as if fully set forth herein.

44.     Shire HGT and Shire have made false and/or misleading statements, including without limitation the statements described in Paragraphs 28 through 34, in commercial advertisements and promotional materials, in violation of the Lanham Act, 15 U.S.C. § 1125.

45.     The statements made by Shire HGT and Shire were directed at least to patients suffering from Type 1 Gaucher disease who require enzyme replacement therapy and to healthcare professionals who may treat Type 1 Gaucher patients.

46.     The statements made by Shire HGT and Shire have deceived or are likely to

deceive customers regarding the true nature and characteristics of the analysis conducted on improvement to BMD for patients taking Cerezyme and VPRIV, and on each drug's comparative capabilities.

47.    The statements made by Shire HGT and Shire are directed to inherent attributes of VPRIV and likely have materially influenced and likely will materially influence purchasing decisions in part because current or prospective customers, including patients and healthcare providers, are led to believe incorrectly that the analysis described in the Shire Press Release demonstrated that VPRIV improves BMD better than Cerezyme, causing current or prospective customers to choose Shire's VPRIV instead of Genzyme's Cerezyme drug.

48.    The false and misleading advertising claims likely have resulted and likely will result in the loss of good will and the loss of current and prospective customers who, but for the false and misleading advertising claims made by Shire HGT and Shire, would have done business with Genzyme.

49.    The statements made by Shire HGT and Shire affect and were placed into interstate commerce by being posted on the Shire website, distributed to PR Newswire for dissemination to media outlets throughout the country, and distributed through a public relations agency to certain patient organizations.

50.    Shire HGT and/or Shire knew their commercial advertisements and promotional materials were false and/or misleading or acted with intent to deceive or in reckless disregard of the truth of such statements.

51.    As a direct and proximate result of the conduct of Shire HGT and Shire, Genzyme has suffered and will continue to suffer irreparable injury, including without limitation loss of goodwill and actual and likely diversion of sales.

52.     As a direct and proximate result of the conduct of Shire HGT and Shire, Genzyme has incurred and will likely continue to incur actual damages, entitling Genzyme to injunctive relief, corrective advertising, retraction of the Shire Press Release, treble damages, the profits derived from the unlawful acts of Shire HGT and Shire, and increased pursuant to the principles of equity in accordance with the provisions of 15 U.S.C. §§ 1116 and 1117.

**JURY DEMAND**

Genzyme hereby demands a jury trial on all issues so triable.

**RELIEF REQUESTED**

WHEREFORE, Genzyme asks this Court to enter judgment against Shire HGT and Shire granting the following relief:

(a)     Declaring that Shire HGT and Shire have engaged in false advertising, promotion and descriptions under § 43(a) of the Lanham Act, 15 U.S.C. §1125(a);

(b)     Awarding Genzyme damages in an amount to be proven at trial;

(c)     Requiring Shire HGT and Shire to disgorge all ill-gotten gains flowing from the conduct described in this Complaint and awarding to Genzyme an appropriate pro-rata share of such ill-gotten gains received by Shire HGT and Shire;

(d)     Preliminarily and permanently enjoining Shire HGT and Shire, their officers, agents, and employees, and all persons those in active concert or participation with them, from further engaging in the conduct described in this Complaint, including but not limited to removing the Press Release from circulation;

(e)     Requiring Shire HGT and/or Shire to issue a corrective press release

informing the public of the false and/or misleading nature of its original Shire Press Release;

(f)     Awarding to Genzyme its costs and attorneys' fees associated with the suit herein, to the extent not covered or allowed by the above; and

(g)     Awarding such other and further relief as the Court and/or a jury deems just and proper.


Dated: July 30, 2012                          Respectfully Submitted,


                                              By:   /s/ Scott P. Lewis
                                              Scott P. Lewis, BBO # 298740
                                              ANDERSON & KREIGER LLP
                                              One Canal Park, Suite 200
                                              Cambridge, M.A. 02141
                                              (617) 621-6560
                                              slewis@andersonkreiger.com

                                              Steven P. Hollman (*pro hac vice* pending)
                                              Laura E. Schabinger (*pro hac vice*
                                              pending)
                                              HOGAN LOVELLS US LLP
                                              555 Thirteenth Street, N.W.
                                              Washington, D.C. 20004
                                              (202) 637-5672 (Telephone)
                                              (202) 637-5910 (Fax)
                                              steven.hollman@hoganlovells.com
                                              laura.schabinger@hoganlovells.com

                                              *Attorneys for Plaintiff*
                                              *Genzyme Corporation*

## VERIFICATION OF COMPLAINT

I, the undersigned Head of Clinical Development of Genzyme Corporation having read the allegations of the foregoing Verified Complaint filed on behalf of Genzyme Corporation in this proceeding, hereby certify based on my personal knowledge that the factual allegations asserted in the Verified Complaint are true and correct, and that matters asserted upon information and belief are believed to be true and correct.

Pursuant to the Provisions of 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 30th day of July 2012.

Richard A. Moscicki, M.D.