UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 12-11386-RGS

GENZYME CORP.

v.

SHIRE HUMAN GENETIC THERAPIES, INC, and SHIRE plc

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS

November 29, 2012

STEARNS, D.J.

Plaintiff Genzyme Corp. alleges in a Verified Complaint (VC) that defendants Shire Human Genetic Therapies, Inc. (Shire HGT), and Shire plc, violated the Lanham Act, 15 U.S.C. § 1125 et seq., by publishing and distributing a press release falsely advertising the superior qualities of Shire's Gaucher disease treatment drug VPRIV over those of Genzyme's competing brand, Cerezyme.  Shire HGT moves to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim for which relief may be granted.  Shire plc moves to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).  The issues being fully briefed, the motion of Shire HGT will be denied, while the motion of Shire plc will be allowed.

BACKGROUND

Gaucher disease is a rare genetic disorder caused by a deficiency of

glucocerebrosidase, an enzyme that breaks down fatty substances (lipids) that accumulate in body tissues. VC ¶ 10. Without the enzyme, the buildup of harmful amounts of lipids prevents cells and organs from functioning properly. *Id.* Symptoms of Gaucher disease include enlargement of the liver and spleen and reduced bone mineral density, bone thinning, and weakened bones that are easily fractured. *Id.* ¶¶ 10-12. Approximately 10,000 people worldwide, including 3,200 people in the United States, suffer from Gaucher disease. *Id.* ¶ 13. It is particularly prevalent among Ashkenazi Jews.

Genzyme, a subsidiary of Sanofi SA, is a Massachusetts biotechnology company that focuses on treatments for rare genetic disorders, including Gaucher disease. *Id.* ¶ 6. In 1994, Genzyme received Food and Drug Administration (FDA) approval to manufacture and sell a drug called Cerezyme (imiglucerase for injection), a long-term enzyme replacement therapy for patients with Type 1, the most common of the three types of Gaucher disease. *Id.* ¶¶ 11 & 14. Cerezyme acts like a naturally occurring enzyme and targets cells in which a buildup of lipids occurs. *Id.* ¶ 14. Over the years, Cerezyme has been used by approximately 6,000 Gaucher disease patients. *Id.*

Shire HGT is a specialty biopharmaceutical company that is incorporated in Delaware and headquartered in Massachusetts. *Id.* ¶ 7. Shire plc, a holding company and an indirect parent company of Shire HGT, is incorporated under the laws of the

Bailiwick of Jersey and is a tax resident of Ireland.  Stewart Decl. ¶¶ 3 - 4 & 7.[1]  Shire

HGT manufactures and sells a long-term enzyme replacement therapy for Gaucher

disease, called VPRIV (velaglucerase alfa for injection).  VC ¶ 7.  VPRIV received

FDA approval in 2010.  *Id.* ¶ 15.  Cerezyme and VPRIV are the major players in the

Gaucher disease enzyme replacement therapy market.  *Id.* ¶ 16.

On June 28, 2012, Shire HGT issued a press release entitled "Shire's VPRIV

(velaglucerase alfa for injection) Shows Significant Improvement in Gaucher-Related

Bone Disease."  VC ¶ 17 & Ex. A.  The subheadline of the press release stated that

"[i]n a head-to-head trial between VPRIV and Cerezyme (imiglucerase), only patients

treated with VPRIV experienced statistically significant improvement in lumbar spine

bone mineral density at 9 months."  VC - Ex. A.  The press release trumpeted "new

data that show VPRIV (velaglucerase alfa for injection), the company's enzyme

replacement therapy for [T]ype 1 Gaucher disease, significantly improved selected

markers of Gaucher-related bone disease in patients."[2]  *Id.*  In particular,

> [r]esults from a head-to-head Phase III study (HGT-GCB-039) of VPRIV
> and Cerezyme, and follow-on extension trial (HGT-GCB-044) of VPRIV,

---

[1] For purposes of evaluating personal jurisdiction, the court may consider "facts put forward by the defendants, to the extent that they are uncontradicted."  *Negron-Torres v. Verizon Commc'ns, Inc.*, 478 F.3d 19, 23 (1st Cir. 2007).

[2] The data was presented at the European Working Group on Gaucher Disease (EWGGD) meeting held in Paris, France, June 28-30, 2012.

demonstrate a statistically significant improvement in lumbar spine (LS) BMD [(bone mass density)] in Gaucher patients starting at nine months of treatment with VPRIV (P<0.05). Patients participating in the study were administered 60 U/kg every other week of either VPRIV or Cerezyme for nine months as part of the HGT-GCB-039 study. All patients, including those who received Cerezyme, subsequently received 60 U/kg every other week of VPRIV for an additional 15 months in the extension trial (HGT-GCB-044).

Clinically and statistically significant improvement from baseline in mean LS Z-score was seen at nine months of treatment with VPRIV, but not in the cohort of patients treated with Cerezyme. BMD, evaluated as an exploratory endpoint in the Phase III and extension studies, was measured by dual-energy x-ray absorptiometry (DEXA scan). Median LS Z-scores at baseline were -1.46 (-3.50, 0.98) in patients treated with VPRIV, and -0.86 (-2.17, 2.02) in patients treated with Cerezyme. Mean changes from baseline in LS Z-scores at nine months were 0.33 (0.10, 0.55) and 0.06 (-0.22, 0.34), respectively. Following an additional 15 months of treatment, mean change in LS Z-scores improved to 0.64 (0.22, 1.06) for patients initially treated with VPRIV and improved to 0.54 (0.21, 0.87) for patients who switched to VPRIV from Cerezyme at nine months.

*Id.*

Shire HGT posted the press release in an investor news section on Shire plc's webpage. VC ¶ 17, Cotrone Decl. ¶ 3. Shire HGT distributed the press release to PR Newswire for dissemination to interested media outlets. VC ¶ 19. *See also* Cotrone Decl. ¶ 3. Shire HGT also had its public relations agency distribute the press release to patient organizations serving the Gaucher community, including the National Gaucher Foundation. VC ¶ 20. *See also* Cotrone Decl. ¶ 3. Several news articles picked up on the press release and reported the clinical findings touted by Shire HGT.

4

VC ¶¶ 36-37.

On July 9, 2012, Genzyme wrote to Shire HGT outlining what it believed were methodological weaknesses in the data analysis reported in the press release. Genzyme demanded that Shire HGT retract the press release and the comparative claims promoting VPRIV as superior to Cerezyme. *Id.* ¶ 38-39. On July 23, 2012, Shire HGT informed Genzyme that it would not comply. *Id.* ¶ 41. Genzyme responded by filing this lawsuit on July 30, 2012. In its Verified Complaint, Genzyme alleges that the Shire HGT press release violated the false advertising prohibition of the Lanham Act. In limning the elements of the prohibition, Genzyme alleged that the press release was "directed at least to patients suffering from Type 1 Gaucher disease who require enzyme replacement therapy and to healthcare professionals who may treat Type 1 Gaucher patients," *id.* ¶ 45; that it "contain[ed] false and misleading claims about the nature of the clinical trials and retrospective analysis conducted on BMD [(bone mass density)] data . . . [and] false and misleading claims about the comparative capabilities of VPRIV and Cerezyme for improving BMD in Type 1 Gaucher patients," *id.* ¶ 29, *see also id.* ¶¶ 28-34; and that it "likely [has] materially influenced and likely will materially influence purchasing decisions in part because . . . customers . . . are led to believe incorrectly that the analysis described in the Shire Press Release demonstrated that VPRIV improves BMD better than Cerezyme . . . ." *Id.* ¶ 47.

## SHIRE HGT'S 12(b)(6) MOTION

To survive a motion to dismiss brought pursuant to Rule 12(b)(6), the factual allegations of the complaint must "possess enough heft" to set forth "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 559 (2007); *Thomas v. Rhode Island*, 542 F.3d 944, 948 (1st Cir. 2008). As the Supreme Court has emphasized, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal citations and quotation marks omitted).

"Dismissal for failure to state a claim is appropriate if the complaint fails to set forth factual allegations, either direct or inferential, respecting each material element necessary to sustain recovery under some actionable legal theory." *Gagliardi v. Sullivan*, 513 F.3d 301, 305 (1st Cir. 2008) (citations omitted). The elements of a Lanham Act false advertising claim are

> (1) the defendant made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product; (2) the misrepresentation is material, in that it is likely to influence the purchasing decision; (3) the misrepresentation actually deceives or has the tendency to deceive a substantial segment of its

audience; (4) the defendant placed the false or misleading statement in interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the misrepresentation, either by direct diversion of sales or by a lessening of goodwill associated with its products.

*Cashmere & Camel Hair Mfrs. Inst. v. Saks Fifth Ave.*, 284 F.3d 302, 310-311 (1st Cir. 2002).

In support of its motion to dismiss, Shire HGT first argues that Genzyme's Verified Complaint fails as a matter of law because the press release did not amount to commercial advertising or promotion.  To qualify as a commercial advertisement, "a representation must (a) constitute commercial speech (b) made with the intent of influencing potential customers to purchase the speaker's goods or services (c) by a speaker who is a competitor of the plaintiff in some line of trade or commerce and (d) disseminated to the consuming public in such a way as to constitute 'advertising' or 'promotion.'"  *Podiatrist Ass'n, Inc. v. La Cruz Azul De Puerto Rico, Inc.*, 332 F.3d 6, 19 (1st Cir. 2003).  Shire HGT contends that its press release is not commercial speech, but rather "scientific speech" that is  protected by the First Amendment.  *See Miller v. California*, 413 U.S. 15, 35-36 (1973).  As Shire HGT views it, the press release rose above ordinary marketing speech that "does no more than propose a commercial transaction," *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001), by informing a broad audience of new scientific research establishing the

7

superiority of VPRIV as a Gaucher treatment drug.  Moreover,

> [t]here is no way Shire could have fairly or accurately reported the results
> of its research on VPRIV and Cerezyme without identifying the products
> at issue.  Thus, any commercial elements of the press release were
> "inextricably intertwined" with protected, noncommercial scientific
> expression, requiring treatment of the entire press release as "fully
> protected expression."

Shire HGT Mem. at 11.

Genzyme agrees that scientific research is protected by the First Amendment, but argues that its secondary dissemination can constitute commercial speech if it is given a pecuniary gloss.  *See Washington Legal Found. v. Friedman*, 13 F. Supp. 2d 51, 62-65 (D.D.C. 1998), vacated in part on other grounds, 202 F.3d 331 (D.C. Cir. 2000) (*WLF*).  In *WLF*, the court considered whether under the commercial speech doctrine, the FDA could regulate the dissemination of medical textbook and journal reprints and continuing medical education (CME) seminars that promote off-label uses for prescription drugs.  Although the question "is not an easy one," *id.* at 62, the court concluded that selective and/or targeted secondary dissemination of scientific research "is properly classified as commercial speech," *id.* at 65.  "It is beyond dispute that when considered outside of the context of manufacturer promotion of their drug products, CME seminars, peer-reviewed medical journal articles and commercially-available medical textbooks merit the highest degree of constitutional protection," *id.*

at 62, but "[t]he peculiarities of the prescription drug industry make dissemination of scientific research results an especially important and prevalent marketing tool," *id.* at 63.

> For any given off-label prescription drug treatment, there may be a wide variety of scientific research data available, some of which concludes that the off-label treatment is effective, some of which concludes that the treatment is not. [However], manufacturers will likely only seek to disseminate information that presents their product in a favorable light. That fact, combined with the considerable financial resources available to pharmaceutical companies, means that findings concluding that a drug effectively treats a condition is more likely to reach a physician than studies reaching the opposite conclusion. Therefore, physicians could be led to believe that a certain drug is safe and effective because a manufacturer has found, and aggressively promoted, "the one" article that supports use of their drug, even if there exists considerable evidence to the contrary. The potential to mislead, and the harm that could result, convinces this court that it is permissible to "depart from the rigorous review that the First Amendment generally demands."

*Id.* at 65.

In *Gordon & Breach Sci. Publ'rs S.A. v. Am. Inst. of Physics*, 859 F. Supp. 1521 (S.D.N.Y 1994), the court similarly found that the secondary dissemination of a comparative survey of science journals favoring defendant's publications – itself protected speech – was "explicitly promotional in nature" when targeted at librarians – the "audience that represents the core consumers of those products." *Id.* at 1544.

> The situation is similar to that of a restaurant or movie review or a *Consumer Reports* product report. While the restaurant review or product report itself constitutes exactly the type of "consumer or editorial

comment" that "raise[s] free speech concerns" and which Congress
explicitly intended to exclude from [the Lanham Act]'s scope, . . . a
restaurant clearly engages in commercial speech when it posts the New
York Times review in its window, and General Motors engages in
commercial speech when it announces in a television commercial that its
car was ranked first by *Consumer Reports*. The *Consumer Reports*
article, of course, does not somehow become commercial speech; rather,
G.M.'s *use* of the article is commercial speech. Consequently, G.M. may
be sued under the Lanham Act, and *Consumer Reports*' testing
methodology may become subject to judicial scrutiny to determine
whether G.M. "use[d] in commerce" a "false or misleading representation
of fact." We do not reach a different conclusion here merely because the
secondary user of the articles is the same entity that published them in the
first place.

*Id.* at 1544-1545.

The reasoning underlying the holdings of *WLF* and *Gordon & Breach* has been

found to apply in contexts similar to this one. In *Bracco Diagnostics, Inc. v.*

*Amersham Health, Inc.*, 627 F. Supp. 2d 384 (D.N.J. 2009), the court, relying on *WLF*

and *Gordon & Breach,* found that the secondary dissemination (in press releases and

promotional materials) to potential customers of a survey article from the *New England*

*Journal of Medicine*, comparing two x-ray contrast media in a head-to-head

competition, constituted commercial speech. *Id.* at 458-459. In this case, while the

original presentation of the comparative data at the EWGGD convocation was

protected scientific expression, its secondary dissemination in a press release by Shire

HGT was not. The press release was not a scientific publication, it directly named

VPRIV and Cerezyme, the two principal competitors in the Gaucher disease enzyme replacement therapy market, and it listed Shire plc's stock symbols on its first line. *See United States v. Harkonen*, 2009 WL 1578712, at *6 (N.D. Cal. June 4, 2009) ("That the speech is a press release and not a peer-reviewed publication, that it refers to a specific commercial product on the market . . . , and that it was unquestionably disseminated for commercial benefit (e.g., the first line notes [defendant]'s Nasdaq stock symbol), are allegations that take the speech at issue outside the realm of pure science speech and move it towards the realm of commercial speech."). Like the promotional speech in *Gordon & Breach* and *Bracco*, the press release selectively disseminated information favorable to Shire HGT's VPRIV and unflattering to Cerezyme to an audience that included both physicians who prescribe Gaucher disease treatments and patients (e.g., those served by the National Gaucher Foundation) who might request a specific treatment. Under the circumstances, Shire HGT's press release may be deemed commercial speech.

Shire HGT's fallback argument is that even if the press release constituted commercial speech, Genzyme's Verified Complaint fails to allege that it contained literally false statements, impliedly false or misleading statements, or embellished claims, because the press release accurately reported the underlying scientific analysis and results. Unless the complained of speech is such that "a court can properly say that

no reasonable person could be misled by the advertisement in question," *Pernod Ricard USA, LLC v. Bacardi U.S.A., Inc.*, 653 F.3d 241, 252 (3rd Cir. 2011), "it is not appropriate to resolve [the issue of the truthfulness of the speech] on a motion to dismiss." *World Wrestling Fed'n Entm't, Inc. v. Bozell*, 142 F. Supp. 2d. 514, 529 (S.D.N.Y. 2001). In *Pernod*, the court found that despite the prominent mark "Havana Club," Bacardi's rum labels were not misleading because they clearly stated that the product was "Puerto Rican Rum" that was "distilled and crafted in Puerto Rico." *Pernod*, 653 F.3d at 252. In contrast, Genzyme alleges that the press release conveyed the literally false message that VPRIV outperforms Cerezyme in improving patient BMD. VC ¶ 28. Unlike the clear picture in *Pernod*, the veracity of this allegation involves a delving into murky scientific data and analysis, a task that cannot be satisfactorily undertaken on a motion to dismiss where the court is largely confined to the allegations of the complaint.[3]

---

[3] Genzyme also alleges that (1) rather than being "new," the data reported by Shire HGT's press was release collected in clinical trials in 2008-2009, VC ¶ 31; (2) despite stating that BMD was an exploratory end point of the reported clinical trials, the press release gives the misleading overall impression that the clinical trials were designed to test VPRIV and Cerezyme's efficacy vis-à-vis BMD, VC ¶ 32; and (3) the underlying clinical trials and analysis suffered from a variety of undisclosed methodological defects that biased or failed to support the results. VC ¶ 33-34. *Cf. Goron & Breach*, 859 F. Supp. at 1544 ("*Consumer Reports*' testing methodology may become subject to judicial scrutiny to determine whether G.M. 'use[d] in commerce' a 'false or misleading representation of fact.'"). These also are complex factual allegations whose veracity cannot be fairly tested by way of a motion to dismiss.

Shire HGT finally argues that Genzyme has failed to sufficiently allege the necessary element of consumer deception because the physicians who prescribe Gaucher disease treatments are sophisticated experts who are not easily misled. However, as the court noted in *WLF*, a pharmaceutical manufacturer's selective promotion of favorable scientific information could be potentially misleading even to sophisticated and experienced doctors. *WLF*, 13 F. Supp. 2d at 65. Moreover, patients, who are less sophisticated, also constitute a segment of the relevant audience because they are the ultimate consumers of the prescribed medication. *See Kos Pharm. Inc. v. Andrx Corp.*, 369 F.3d 700, 715 n.12 (3d Cir. 2004) (noting the increasing prevalence of prescription medication advertisements that are aimed directly at influencing patient choices). At the pleading stage Genzyme is entitled to the benefit of a presumption of consumer deception because it has alleged the dissemination of literally false statements. *Cashmere*, 284 F.3d at 314-315. Because all of the necessary elements of a Lanham Act violation are sufficiently plead, Shire HGT's motion to dismiss will be denied.

## SHIRE PLC'S 12(b)(2) MOTION

As plaintiff, Genzyme ultimately bears the burden of persuading the court that in personam jurisdiction exists over Shire plc. *See Mass. Sch. of Law at Andover, Inc. v. Am. Bar Ass'n*, 142 F.3d 26, 34 (1st Cir. 1998). At the motion to dismiss stage, a

court ordinarily applies a prima facie standard and construes the facts affirmatively alleged by Genzyme "in the light most congenial to [its] jurisdictional claim." *Id.* "However, '[t]he prima facie showing of personal jurisdiction must be based on evidence of specific facts set forth in the record.' In other words, '[t]he plaintiff must go beyond the pleadings and make affirmative proof.'" *Negron-Torres*, 478 F.3d at 23, quoting *Boit v. Gar-Tec Prods., Inc.*, 967 F.2d 671, 675 (1st Cir. 1992). "A court need not . . . credit bald allegations or unsupported conclusions." *Carreras v. PMG Collins, LLC*, 660 F.3d 549, 552 (1st Cir. 2011).

Genzyme does not seriously assert that the court has general personal jurisdiction over Shire plc.[4]   Rather, it alleges specific jurisdiction. "Specific personal jurisdiction . . . may only be relied upon 'where the cause of action arises directly out of, or relates to, the defendant's forum-based contacts.'" *Pritzker v. Yari*, 42 F.3d 53, 60 (1st Cir. 1994), quoting *United Elec. Workers v. 163 Pleasant St. Corp.*, 960 F.2d 1080, 1088-1089 (1st Cir. 1992).  To be constitutionally fair,[5] the exercise of specific jurisdiction

---

[4] As will be seen, Shire plc's only contact with this forum – guaranteeing certain of Shire HGT's leases of real property in Massachusetts, Stewart Decl. ¶ 7 – would not rise to the level of "'continuous and systematic general business contacts'" between Shire plc and Massachusetts.  *United States v. Swiss Am. Bank, Ltd.*, 274 F.3d 610, 619 (1st Cir. 2001), quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 416 (1984).

[5] A federal court may only exercise personal jurisdiction in Massachusetts consistent with the Massachusetts Long-Arm Statute and within the constitutional limits

must meet a three-part test:

> [f]irst, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state activities.  Second, the defendant's in-state contacts must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's courts foreseeable.  Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Pleasant St.*, 960 F.2d at 1089.

The lynchpin of this test is the second element – purposeful availment.  Genzyme argues that Shire plc purposefully availed itself of the privilege of conducting business in Massachusetts because "Shire [plc] took actions to create the Shire Press Release and make it available on its website," thereby targeting and harming Genzyme, a Massachusetts company.  Genzyme Opp'n at 9.  "Second, Shire [plc] has entered into an exclusive agreement with Shire HGT to sell VPRIV in Massachusetts and the United States."  *Id.*  Therefore, it was "foreseeable that Shire [plc] might one day end up before the courts of Massachusetts."  *Id.*

Neither allegation withstands scrutiny.  First, it is uncontradicted that Shire HGT, and not Shire plc, created the press release and was responsible for its publication on

---

of due process.  *Pleasant St.*, 960 F.2d at 1086.  The Supreme Judicial Court interprets the Massachusetts Long-Arm Statute as co-extensive with the jurisdictional limits permitted under the U.S. Constitution.  *See "Automatic" Sprinkler Corp. of Am. v. Seneca Foods Corp.*, 361 Mass. 441, 443 (1972).

the Shire plc website.[6]  Genzyme has not pointed the court to any case finding purposeful availment where a *third*-party has disseminated information on a passive host's website.  Second, the public records maintained by the FDA and the United States Trademark Office establish that Shire HGT holds the authorization to market and sell VPRIV, and is the owner of the VPRIV mark.  Moreover, the existence of a license agreement between Shire plc and Shire HGT would not support a finding of specific personal jurisdiction in this case, as the Lanham Act claim does not arise out of the relationship between Shire plc and Shire HGT.  Because Genzyme has failed to satisfy the "purposeful availment" prong of the personal jurisdiction test, it is unnecessary to address the remaining prongs.

The final arrow in Genzyme's quiver is the argument that, even in the absence of direct specific jurisdiction, the court should impute Shire HGT's actions to Shire plc, and treat Shire plc as the alter-ego of Shire HGT for jurisdictional purposes.  To overcome the presumption of separate corporate identity and assert personal jurisdiction over a parent corporation based on its subsidiary's forum contacts, there must be a "plus" factor "beyond the subsidiary's mere presence within the bosom of the corporate family."  *Donatelli v. Nat'l Hockey League*, 893 F.2d 459, 465-466 (1st

---

[6] That Shire HGT's press release identified Shire plc and its stock trading symbols is not unusual given that Shire plc is Shire HGT's ultimate corporate parent.

Cir. 1990).  These "plus" factors include an agency relationship between the two corporations, a degree of control by the parent that is more than common ownership and directorship, or clear and convincing evidence that the subsidiary is not a functioning entity, but simply an empty shell.  *Id.* at 466.  The evidence Genzyme has marshaled does not meet the applicable test.  *See Escude Cruz v. Ortho Pharm. Corp.*, 619 F.2d 902, 905 (1st Cir. 1980) (presumption of corporate separateness must be overcome by clear and convincing evidence).  The allegation that Shire plc purchased Shire HGT's corporate campus in Massachusetts is refuted by public records.  Shire plc's inclusion of Shire HGT in its Securities and Exchange Commission filings and publicity materials amounts to nothing more than evidence of "common ownership and directorship."  Finally, Genzyme has come forward with no evidence that implicates Shire plc in the composition and dissemination of the press release.

Anticipating this finding, Genzyme requests the opportunity to take discovery to bolster its claim for personal jurisdiction over Shire plc.  The court has the discretion to permit limited jurisdictional discovery where a plaintiff has made out a "colorable case" for the existence of personal jurisdiction and has "present[ed] facts to the court which show why jurisdiction would be found if discovery were permitted."  *Negron-Torres*, 478 F.3d at 27 (citation omitted).  This, Genzyme has not done.

ORDER

For the foregoing reasons, Shire HGT's motion to dismiss for failure to state a claim for which relief may be granted pursuant to Fed. R. Civ. P. 12(b)(6) is <u>DENIED</u>. Shire plc's motion to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. R. 12(b)(2) is <u>ALLOWED</u>.  Genzyme and Shire HGT are directed to submit a joint proposed Discovery Order within fourteen (14) days of the date of this opinion.  The Clerk will cancel the hearing tentatively scheduled for December 13, 2012.


SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE

18